RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JEANNE KING,

> *Plaintiff-Appellant,*

*v.*

No. 21-3445

STEWARD TRUMBULL MEMORIAL HOSPITAL, INC.,

> *Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:19-cv-00720—Pamela A. Barker, District Judge.

Argued:  January 27, 2022

Decided and Filed:  April 7, 2022

Before:  CLAY, GRIFFIN, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Gary A. Reeve, REEVE LAW, Hilliard, Ohio, for Appellant.  W. Scott Hastings, LOCKE LORD LLP, Dallas, Texas, for Appellee.  **ON BRIEF:**  Gary A. Reeve, REEVE LAW, Hilliard, Ohio, Irene K. Makridis, MAKRIDIS LAW, Warren, Ohio, for Appellant.  W. Scott Hastings, LOCKE LORD LLP, Dallas, Texas, for Appellee.

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined.  GRIFFIN, J. (pp. 23–26), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

CLAY, Circuit Judge.  Plaintiff Jeanne King, a former employee of Defendant Steward Trumbull Memorial Hospital (the "Hospital"), sued the Hospital alleging violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*; and Ohio Revised Code § 4112, *et seq.*  The Hospital filed a motion for summary judgment, which the district court granted.  *King v. Steward Trumbull Mem. Hosp., Inc.*, No. 19-cv-720, 2021 WL 1578076, at *1 (N.D. Ohio Apr. 22, 2021).  For the reasons set forth below, we **REVERSE** the district court's order and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

Jeanne King began working for the Hospital as a registered nurse in 2002.  Over the next five years, King worked in various departments until she landed in the emergency department, where she was supervised by Dale Bungard.  Bungard supervised King from approximately 2007 until King's termination on June 2, 2017.  Bungard described King as a "competently skilled emergency nurse."  (Bungard Dep., R. 50, Page ID #1395.)

#### 1.  King's Medical Condition

King was diagnosed with asthma as a young adult, but it began worsening around 2013 and 2014.  Her asthma was often triggered by stress and seasonal allergies, causing intermittent flare-ups and severe asthma attacks.  At times, these flare-ups left King unable to perform her work duties.  Her co-workers occasionally helped her by giving her more stationary tasks. During particularly bad asthma flare-ups, King could not complete daily tasks like cooking and doing dishes.  On those days, King would call in sick and tell the Hospital why she could not work that day.

To call in sick, King usually called the central staffing office and spoke to the house supervisor—who was not always Bungard, her immediate supervisor.  However, King called Bungard directly several times and said that she needed time off because of her asthma.  She said:

> When [she] called [Bungard] to report off of work . . . [she] would tell him that [she] literally could not breathe.  Most of the time when it was that bad, [she] could hardly talk.  And [she] would tell [Bungard] that [she couldn't] get off of the couch without being out of breath and wheezing.

(King Dep., R. 44, Page ID #210–11.)  Bungard "was aware that [King] had asthma," and he said that King's asthma was "common knowledge" among the Hospital staff.  (Bungard Dep., R. 50, Page ID #1393–94.)  He also knew that King "was off [work] sometimes because of her asthma." (*Id.* at Page ID #1411.)  King allegedly told Bungard that her "asthma was so debilitating that it was disabling."  (King Dep., R. 44, Page ID #211.)

2.  The Hospital's Medical Leave Policies

The Hospital allows employees to seek medical leaves of absence to handle personal illnesses and disabilities through two channels.  First, the Hospital offers up to twelve weeks of unpaid leave—either continuous or intermittent—under the FMLA ("FMLA leave").  To be eligible for FMLA leave, employees must have worked at least 1,250 hours in the past year.  The Hospital's FMLA leave policy tells employees how to apply for leave and provides that:

> When the leave is foreseeable, an employee must give 30 days advance notice. When the leave is not foreseeable, notice should be given as soon as possible.  In the case of medical emergencies[,] the employee . . . should contact the department manager by telephone as soon as possible.

(Hospital Leave of Absence Policy, R. 44, Page ID #423.)  Second, under the Collective Bargaining Agreement ("CBA"), employees may seek unpaid medical leave even if they are not eligible for FMLA leave ("non-FMLA leave").  The CBA allows up to one year of non-FMLA leave.  To apply for non-FMLA leave, employees must submit a written request and medical documentation from their physician either two weeks before the start of the leave "or as soon as circumstances allow."  (CBA, R. 44, Page ID #382–83.)

The Hospital uses a third-party administrator called FMLASource to handle both FMLA and non-FMLA leave requests.  If an employee only applies for FMLA leave but does not meet the 1,250 hours requirement, then FMLASource must consider whether the employee qualifies for non-FMLA leave.   Therefore, when "an employee is not eligible for FMLA leave, FMLASource should determine whether the employee is entitled to . . . another leave offered pursuant to [the Hospital's] policies and/or the applicable collective bargaining agreement." (Fischer Decl., R 49-2, Page ID #1378.)   "Employees are not required to submit multiple requests for leave upon denial of a request for FMLA leave."  (*Id.*)  In accordance with the Hospital's policy, leave requests and medical documentation go through FMLASource rather than the employee's direct supervisors.  King had experience dealing with FMLASource; she received both FMLA and non-FMLA leave on several occasions in 2015 and 2016.

### 3. The Hospital's Attendance Policy

Under its attendance policy, the Hospital may discipline employees for "excessive absenteeism" after three "different occasions" in a year.  (Hospital Work Rules, R. 44, Page ID #435–36.)  The policy defines "occasion" as "one day or any number of consecutive days," and clarifies that:

> For example, four consecutive days off due to an illness would be a single occasion.  If the employee returns to work and a week later is absent because of the same or different illness, this would be a separate occasion of absence.

(*Id.*)  Violations of the policy are subject to progressive discipline:  a verbal warning after the third occasion, a written warning after the fourth, and probation after the fifth.  Any further occasions of absence could lead to discharge.

After her asthma worsened in 2013 and 2014, King was absent on several occasions due to her asthma flare ups.  Some of these absences were covered by either FMLA or non-FMLA leave.  Over the years, Bungard gave King several written and verbal warnings for attendance issues.  But Bungard occasionally withdrew the disciplinary actions after the Hospital excused King's absences under a medical leave policy.   In one discipline report, Bungard noted "Discipline Cancelled," scratched out two absence periods, and jotted "error FML" next to the excused absence dates.  (Discipline Rep., R. 44, Page ID #444.)

4. <u>King's April 2017 Asthma Flare-Up</u>

This lawsuit arises out of one of King's particularly severe asthma flare-ups that began in April 2017. Between 2016 and 2017, King worked three shifts each week from 6:00 a.m. to 6:30 p.m. On April 28, 2017,[1] King reported for her twelve-hour shift at the Hospital. But King did not complete her shift because, about eight hours into her workday, she had an asthma attack that left her unable to breathe. Over the next five weeks, King continued to suffer from severe asthma-related symptoms. At the peak of her flare-up, on May 15, her symptoms landed her in the emergency room of the Hospital seeking treatment. King could not work throughout this time, and she called in sick for her next fourteen shifts. She followed Hospital protocols and called either Bungard or the house supervisor at least two hours before each shift and reported that she could not work because of her asthma flare-up. Even though King missed fourteen days of work, Bungard does not remember having to cover any of her shifts, nor does he recall her absence causing any problems.

King regularly saw her physician, Dr. Ramamurthy Alam, during this period. She worked with Dr. Alam to find new medications and treatments for her asthma—including oral steroids, inhalers, and nebulizers. At some point between April 28 and May 15, Dr. Alam told King that she "was not able to return to work" until they developed a better treatment plan. (King Dep., R. 44, Page ID #273.) At that time, Dr. Alam did not give King any documentation indicating that she needed medical leave following her April 28 flare-up. At first, King put off calling FMLASource to ask for leave because she "thought that she was going to improve" and that her flare-up would not be a long-term issue. (King Dep., R. 45, Page ID #712, #715.) Instead, her symptoms got worse, leading to her emergency room visit on May 15. She called FMLASource four days later, on May 19. During that call, King told FMLASource that she "was calling in to request the leave" because of her asthma. (King Dep., R. 44, Page ID #266.) King did not say how much time she needed off. FMLASource "told [King] that [she] was ineligible to apply for a leave because [she] had only worked 300 and some hours in the prior . . . year." (*Id.*) King said that this could not be right because she was a full-time employee. To fix the problem, FMLASource told King to contact Cindy Burns, who worked in the Hospital's

---

[1]From this point onwards, all references to specific dates are for the year 2017.

human resources department. According to King, FMLASource "would not even put in for the leave" because it thought King did not have the hours for FMLA leave. (King Dep., R. 45, Page ID #714.) According to the Hospital, "[a] leave request was not initiated on the basis of this call because [King] asked only about her FMLA eligibility and did not request a leave." (Fischer Decl., R. 49-2, Page ID #1378–79.)

Believing that FMLASource had miscalculated her hours, King called Burns on May 19. King told Burns that she was trying to apply for leave, but that FMLASource was not letting her do so because of her low hours. Burns said that FMLASource did not have an accurate count of King's hours because the Hospital recently changed management, and King's hours had not been properly carried over to the new systems. To fix the error, Burns would need to manually update King's hours. Burns said that she would correct this mistake and follow up with King. A week passed, and King did not hear back from Burns. King then called Bungard. She told him that she "was trying to apply for the hospital's medical leave and FMLA." (King Dep., R. 44, Page ID #271.) King told Bungard about the hours issue and her call with Burns. Bungard said he would investigate and get back to her. A few days later, on May 30, King called FMLASource again "to see if the hours had been corrected so [she] could apply for the leave." (King Dep., R. 45, Page ID #752.) After reaching out to FMLASource on May 19, King kept calling in sick and began telling Hospital supervisors (Bungard and others) that she "was trying to get a leave but [she] hadn't gotten it yet so [she] was reporting off again for the next day." (King Dep., R. 44, Page ID #270.) She specifically told them that she "was trying to apply for [leave]." (*Id.*)

While King was trying to sort out her hours, the Hospital terminated her employment. On June 2, Bungard called her in for a meeting and terminated her for "failure to apply timely for a leave of absence." (Bungard Dep., R. 50, Page ID #1419.) At that time, King still had not heard back from Burns, she had not been able to apply for leave, and, therefore, she had not received an approved leave of absence.

On June 5—three days after her termination—King reached out to FMLASource again to see if they had updated her hours and to apply for leave. Even though FMLASource had finally updated her hours, her corrected timesheets showed that she only worked 1,170 hours in the past year, so she was still ineligible for FMLA leave. The Hospital admits that, on June 5, King

specifically asked for FMLA leave from April 28 to June 1.  "Because [King] was ineligible for FMLA leave, FMLASource next evaluated whether [she] was entitled to any other type of leave."  (Fischer Decl., R. 49-2, Page ID #1379.)  FMLASource sent King a letter on June 5 saying that it was considering her request for leave.  The letter told King that her physician, Dr. Alam, needed to complete a medical certification form and fax it directly to FMLASource. The certification form contemplated leave for employees with "chronic health condition[s]" that "may cause episodic incapacity or flare-ups . . . (*e.g.* asthma . . .)."  (FMLASource Letter, R. 44, Page ID #653.)  Dr. Alam faxed the form to FMLASource on June 6—indicating that King needed medical leave from April 28 to June 1 because she was "[u]nable to work/perform job duties" due to her "chronic health condition."  (*Id.* at Page ID #655.)  Dr. Alam cleared King for work beginning on June 2.

After receiving Dr. Alam's certification form, FMLASource retroactively approved part of King's request.  On June 22,  FMLASource told King that she was entitled to non-FMLA leave because of her asthma.  But FMLASource has "a five-day 'look back' period when making determinations regarding unforeseeable leaves."  (Fischer Decl., R. 49-2, Page ID #1378.)  "That is, an employee was generally granted leave for up to five days prior to the day the employee first requested leave."  (*Id.*)  According to FMLASource, King did not request leave until June 5, and, therefore, it initially only approved leave from May 31 to June 1.  After learning this, King called FMLASource and said that she had applied for leave on May 19.  In response, FMLASource adjusted the look back period and retroactively approved King's request for leave from May 14 to June 1.  It denied her request for leave from April 28 to May 13 because King "did not provide sufficient notice for leave."  (FMLASource Letter, R. 44, Page ID #658.) Despite retroactively approving periods of non-FMLA leave, nothing about this decision affected King's termination on June 2.

## B. Procedural Background

King filed her Complaint on April 1, 2019, and amended it on April 28, 2020. She asserted three causes of action against the Hospital:[2] interference and retaliation in violation of the FMLA, 29 U.S.C. § 2601, *et seq.*; failure to accommodate and disability discrimination in violation of the ADA, 42 U.S.C. § 12112, *et seq.*; and failure to accommodate and disability discrimination in violation of Ohio Revised Code § 4112.01, *et seq.* King sought reinstatement, lost wages, damages for emotional distress, and punitive damages, among other forms of relief.

The Hospital moved for summary judgment on all counts. As to her federal claims, the district court found that King was ineligible for FMLA leave and that she failed to exhaust her ADA claims. *King*, 2021 WL 1578076, at *4–*5. The district court then found that King "abandoned her wrongful termination claim arising under Ohio law," *id.* at *5, because she expressly "limit[ed] her arguments to defending the failure of [the Hospital] to afford her reasonable accommodation of her disability under the laws of the State of Ohio," (Pl. Opp'n to Mot. Summ. J., R. 56, Page ID #1829.) The district court granted the Hospital's motion on the only remaining cause of action, failure to accommodate under Ohio law. *See King*, 2021 WL 1578076, at *13. It found that King could not satisfy a single element of her failure to accommodate claim. *Id.* at *6–*13. On appeal, King only challenges the district court's order as to her failure to accommodate claim under Ohio law.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment *de novo*." *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-

---

[2]King also sued Burns and Bungard in their individual capacities. King later agreed to dismiss these Defendants, and the district court entered an order to that effect on January 25, 2021.

moving party.'"  *Kirilenko-Ison*, 974 F.3d at 660 (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

"When evaluating a motion for summary judgment, this Court views the evidence in the light most favorable to the party opposing the motion." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "This includes drawing 'all justifiable inferences' in the nonmoving party's favor." *Id.* (quoting *George*, 966 F.3d at 458). Moreover, "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Id.* (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

**B.  Analysis**

King claims that the Hospital failed to accommodate her asthma in violation of Ohio Revised Code § 4112, *et seq.* Under Ohio law, "[a]n employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Ohio Admin. Code 4112-5-08(E)(1). The Ohio anti-discrimination law mirrors the ADA, so this Court applies the legal standard under the ADA to claims brought under both laws. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Columbus Civ. Serv. Comm'n. v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998) (citing *Little Forest Med. Ctr. v. Ohio C.R. Comm'n*, 575 N.E.2d 1164 (Ohio 1991)).

In failure to accommodate cases, the plaintiff bears the initial burden of making out a prima facie case. *See Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citing *Deister v. Auto Club Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016)). If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer. *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003) (quoting *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 781–82 (6th Cir. 1998)).

1. <u>Prima Facie Case</u>

King raises genuine disputes of fact that, viewed in her favor, make out a prima facie case.  To establish a prima facie claim for failure to accommodate, "a plaintiff must show that (1) she was disabled within the meaning of the [the statute], (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation."  *Kirilenko-Ison*, 974 F.3d at 669 (citing *Brumley*, 909 F.3d at 839).  The Hospital concedes that King's asthma qualifies as a disability.  The analysis thus turns on the remaining elements.

a. *Qualified for Her Position*

King was a qualified employee if given the reasonable accommodation of medical leave.  "'Qualified disabled person' means . . . a disabled person who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation."  Ohio Admin. Code 4112-5-02(K).  Broken down, this element raises two distinct questions.  *First*, could King perform "essential" functions of a nurse, with or without an accommodation.  A job function is "essential" if removing the function would "fundamentally alter[]" the job.  *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc) (quoting 29 C.F.R. § 1630.2(n)(1)).  *Second*, if King needed an accommodation to perform essential functions, was her required accommodation reasonable.  Reasonable accommodations include any "reasonable adjustment made to a job and/or the work environment," Ohio Admin. Code 4112-5-02(A), and may include "job restructuring" and "modified and part-time work schedules," *id.* 4112-5-08(E)(2).

King argues that she was "well-qualified by education and experience for her job as a Nurse and could perform the essential functions of that position if given the reasonable accommodation of time off of work."  (Pl. Br. at 8.)  With her requested accommodation—medical leave—she could have returned to work and satisfactorily performed her job, as she had done for fifteen years.  The Hospital argues that King's asthma flare-ups made her unqualified for her job because "an essential element of her job as a nurse . . . required regular, in-person

attendance." (Def. Br. at 11.)  According to the Hospital, between April 28 and June 2, King repeatedly missed work and could not perform basic nursing duties.  It concludes that King sought an exemption from an essential job function; thus, her preferred accommodation was per se unreasonable.  King recognizes that she had to be at the Hospital to do her job.  Even so, she argues that medical leave is a reasonable accommodation and, therefore, approved extended absences do not automatically make her unqualified.

It is true that attendance is an essential function of many jobs.  Our Court has found that "with few exceptions, 'an employee who does not come to work cannot perform any of his job functions, essential or otherwise.'"  *Ford Motor*, 782 F.3d at 761 (quoting *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (6th Cir. 2001)).  Therefore, "[r]egular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones."  *Id*. at 762–63.

The Hospital believes that *Ford Motor* decides this case and urges the Court to adopt the following logic:  attendance was an essential function of King's job as a nurse; King's preferred accommodation—medical leave—required extended absences.  Relying solely on *Ford Motor*, the Hospital would have the Court stop there—as the district court did.  *See King*, 2021 WL 1578076, at *6–*7.  Taken to its logical end, however, this argument would bar any in-person employee from obtaining temporary medical leave as an accommodation.  But that cannot be the case in light of the plain language of the ADA.

The plain language of the ADA defines a qualified individual as "an individual who, *with or without* reasonable accommodation, can perform the essential functions [of the job]."  42 U.S.C. § 121118(8).  And the purpose of the ADA's reasonable accommodation requirement is to require employers "to change the way things are customarily done to enable employees with disabilities to work."  EEOC, *Enforcement Guidance: Employer-Provided Leave and the Americans with Disabilities Act* (May 9, 2016).  Leave as a reasonable accommodation is therefore consistent with that statutory purpose because it enables the employee to return to work following the period of leave requested as an accommodation—*i.e.*, it enables the employee to perform the essential function of attendance.

In any event, even after *Ford Motor*, this Court has found that "medical leave can constitute a reasonable accommodation" under certain circumstances. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017) (citing *Cehrs*, 155 F.3d at 783), as have Ohio courts, *see Matasy v. Youngstown Ohio Hosp. Co.*, 95 N.E.3d 744, 752 (Ohio Ct. App. 2017) (citing *Foster v. Jackson Cnty. Broad. Inc.*, 2008 WL 109649 (Ohio Ct. App. 2008)). We recently reached that same conclusion in *Blanchet v. Charter Communs., LLC*, --- F.4th ---, 2022 WL 682540, at *5 (6th Cir. Mar. 8, 2022), where we explained that an employee requesting leave was still otherwise qualified under the ADA because "[e]mployees requesting medical leave often cannot perform their jobs when they request leave, and medical leave allows them time to recover from illnesses or medical procedures."

These outcomes make sense given that *Ford Motor* was not a medical leave case—the plaintiff there requested a permanent modified schedule allowing her to telework up to four days per week. *See* 782 F.3d at 759. Therefore, the "general rule" espoused in *Ford Motor*—that "regularly attending work on-site is essential to most jobs," *id.* at 761—cannot automatically apply where medical leave would enable the employee to return to work and perform the essential job duties. Indeed, "[a]pproved medical leave may be a reasonable accommodation and an inability to work while on such leave does not mean that an individual is automatically unqualified." *Terre v. Hopson*, 708 F. App'x 221, 228–29 (6th Cir. 2017) (citing *Cehrs*, 155 F.3d at 782).

Thus, in medical leave cases, we focus on the reasonableness of the leave request. *See Williams*, 847 F.3d at 393; *Maat v. Cnty. of Ottowa*, 657 F. App'x 404, 412 (6th Cir. 2016). When assessing reasonableness, this Court considers: (1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery. *See Williams*, 847 F.3d at 394; *Maat*, 657 F. App'x at 412–13; *Cleveland*, 83 F. App'x at 78; *Terre*, 708 F. App'x at 229. Viewing the facts in the light most favorable to King, non-FMLA leave would have been a reasonable accommodation for her asthma flare-up.

*First*, we have generally "declined to adopt a bright-line rule defining a maximum duration of leave that can constitute a reasonable accommodation." *Cleveland*, 83 F. App'x at

78.  But we have noted that requests for indefinite leave are likely unreasonable.  *Williams*, 847 F.3d at 394.    Applying this rule, the district court found that King's request was unreasonable because she sought "indefinite leave."  *King*, 2021 WL 1578076, at * 13.  But the record contains many disputes about how much leave she actually sought.  When she called FMLASource on May 19, King did not initially say how much time she needed off.  The hospital argues that this means King sought indefinite leave.  But, according to King, FMLASource did not give her the chance to specify how much time she needed during the May 19 call.  King testified that FMLASource would not let her apply for any kind of leave because FMLASource erroneously believed that King had only worked 300 hours in the past year.    But when FMLASource eventually permitted King to apply for leave on June 5—after King spent weeks fixing FMLASource's mistakes—she asked for a set amount of leave to cover her absences between April 28 and June 1.[3]  Hospital policy allowed her to seek up to twelve weeks of FMLA leave and up to one year of non-FMLA leave.  King ultimately only requested five weeks of leave.  Thus, she did not seek an unreasonable amount of leave according to the Hospital's own leave policies.

*Second*, the record supports King's position that retroactively granting emergency leave can be a reasonable accommodation.  Requests for retroactive leave are not per se unreasonable, and we have recognized employers' practices of granting retroactive leave in unforeseeable situations like this.  *See Williams*, 847 F.3d at 394–95.  Indeed, the Hospital had policies in place to handle these types of requests, including relaxed notice requirements for emergency leave requests and a five-day look back period for retroactive requests.  King's situation fell within these policies.  King did not immediately request medical leave after her April 28 asthma attack because she "thought that she was going to improve" and that her flare-up would not be a long-term issue.  (King Dep., R. 45, Page ID #712, #715.)  Under Hospital policy, King had to request

---

[3]The dissent ignores this point and agrees with the Hospital's assertion that King sought indefinite leave. The dissent writes off the medical documentation that King submitted on June 5 because the Hospital had already terminated King's employment by the time King was allowed to submit her leave application.  But, at the summary judgment stage, the Court must accept King's version of the facts.  According to King, her efforts between May 19 and June 5—including multiple calls to FMLASource, her supervisor, and a Hospital human resources manager— were part of the same attempt to apply for medical leave.  King completed that request on June 5 with a medical certification form stating that she needed a finite period of medical leave between April 28 and June 1.  Therefore, she did not request indefinite leave.

FMLA leave "as soon as possible," (Hospital Leave of Absence Policy, R. 44, Page ID #423), and she had to request non-FMLA leave "as soon as circumstances allow[ed]," (CBA, R. 44, Page ID #382–83.)  King contacted FMLASource to request leave on May 19, shortly after her emergency room visit.  Moreover, FMLASource's own errors caused some of King's failure to give advance notice.  FMLASource miscalculated her hours, and it violated its own policy by refusing to consider King's eligibility for both FMLA and non-FMLA leave when she first sought leave on May 19.  King cannot be faulted for the lengthy application process when the Hospital—through the agent it hired to process leave requests—caused the delays.  Under these circumstances, emergency retroactive leave would be a reasonable accommodation.

Further bolstering this conclusion is the fact that the Hospital ultimately found that King qualified for non-FMLA leave between May 14 to June 1.  By granting King's leave request—even if only partially—the Hospital admitted that retroactive non-FMLA leave was a reasonable accommodation in this case.[4]  If given this accommodation, King would have been a qualified employee.

None of the cases that the Hospital points to require a different conclusion.  Most found that medical leave was not a reasonable accommodation—or the employee was unqualified—when the leave lasted over a year or extended beyond company policies.  *See Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998); *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84–86 (6th Cir. 2012).  In several others, this Court was not considering whether the leave itself was a reasonable accommodation, but whether an employee would be able to perform essential functions of her job after *returning* from an approved leave.  *See Williams*, 847 F.3d at 395; *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 528 (6th Cir. 2015); *Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 402–03 (6th Cir. 2017).

---

[4]As discussed below in Part II.B.1.d, the Hospital granted her request in name only.  King never received the benefits of non-FMLA leave.

### b. *Defendant Knew or Should Have Known of Plaintiff's Disability*

King raised a genuine dispute of fact as to whether the Hospital knew or should have known about her disability.  "An employer has notice of the employee's disability when the employee tells the employer that [s]he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (citing *Gantt*, 143 F.3d at 1046).  "Of course, the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that [s]he is disabled." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016) (citing *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)).  "Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id.* (citing *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737–38 (6th Cir. 2015)).

The Hospital argues that it could not have known about King's disability merely because it "kn[ew] that King had asthma and that she called in sick on many occasions." (Def. Br. at 15.) According to the Hospital, "knowing that King had a health issue is not the same as knowing she had a disability." (*Id.* (citing *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829–30 (S.D. Ohio 2004)).)  But, as King notes, an employee does not have to use "magic words" or explicitly use the word "disability" to put her employer on notice of her condition. *Leeds*, 249 F. App'x at 449 (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)).  The Hospital admits that it knew King had asthma, thus the question is whether the Hospital knew that her condition substantially impaired her ability to perform her essential job functions.  King raised sufficient factual disputes on this point to defeat summary judgment.

Whenever she called in sick, King told her supervisors that it was because of her asthma. She told Bungard that she "literally could not breathe," and that she could not get off the couch "without being out of breath and wheezing." (King Dep., R. 44, Page ID #210–11.)  She even told Bungard that her asthma was debilitating.  When King called FMLASource on May 19, she said that she needed medical leave because of her asthma.  While an employer may not have knowledge of an employee's disability merely because they took leave in the past and the employer is aware that they have some medical issues, *see Messenheimer v. Coastal Pet Prods., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019), King alleges that she repeatedly notified the

Hospital of her severe asthma when her symptoms prevented her from working.  Thus, a jury could find that the Hospital knew that, during flare-ups, King's asthma was so severe that it rose to the level of a disability.

### c. *Plaintiff Requested an Accommodation*

Viewing the facts in King's favor, a jury could conclude that King requested an accommodation on several occasions.  The employee bears the "initial burden of requesting an accommodation." *Gantt*, 143 F.3d at 1046.  "We have generally given plaintiffs some flexibility in how they request an accommodation." *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015) (citing *Talley v. Family Dollar Stores, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008)). Just as an employee does not need to use "magic words" to inform her employer that she is disabled, the employee does not need to explicitly use the word "accommodation." *Leeds*, 249 F. App'x at 449 (citing *Smith*, 376 F.3d at 535).  Medical documentation is not required.  *See Mobley*, 603 F. App'x at 413 (citing *Talley*, 542 F.3d at 1108).  A plaintiff's own requests, whether written or oral, can satisfy this element.  *See id.* (citing *Talley*, 542 F.3d at 1108). Additionally, "an employee's initial request does not need to identify the perfect accommodation from the start." *Ford Motor Co.*, 782 F.3d at 779 (Moore, J., dissenting).

"Once an employee requests an accommodation, the employer has a duty to engage in an interactive process" to try to determine whether the employer can accommodate the employee's disability. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 849 (6th Cir. 2018)); *Rorrer v. City of Stow*, 743 F.3d 1025, 1031 n.1, 1045 (6th Cir. 2014) (citing *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923, 929 (6th Cir. 2013)).  The employer must participate in "good faith" and conduct an "individualized inquiry" into possible accommodations. *Rorrer*, 743 F.3d at 1045 (quoting *Keith*, 703 F.3d at 923).

Construed in King's favor, the record includes four instances that could qualify as a request for an accommodation. *First*, King called in sick for every shift between April 28 and June 2, and she told different supervisors that she could not work because of her asthma. Repeatedly calling in sick, even if it put the Hospital on notice about the severity of her asthma flare-up, does not amount to a request for medical leave if the Hospital had to speculate as to

King's need for extended medical leave. *See Gantt*, 143 F.3d at 1046–47. Initially, when King called in, she did not say that she needed medical leave. The district court rightfully concluded that *these* daily call-ins were not requests for an accommodation. However, beginning on May 19, King started calling in and telling the on-call supervisor (Bungard and others) that she "was trying to get a leave but [she] hadn't gotten it yet so [she] was reporting off again for the next day." (King Dep., R. 44, Page ID #270.) A jury could find that the calls beginning on May 19 were requests for an accommodation because King explicitly told Hospital supervisors that she wanted medical leave to handle her asthma flare-up.

*Second*, King called FMLASource and asked for medical leave on May 19. The district court found that this was not a request for an accommodation and pointed to an unpublished lower court opinion finding that merely asking if medical leave was "a possibility" was not a request for an accommodation. *King*, 2021 WL 1578076, at *11 (citing *Hudson v. First Scholar, Inc.*, No 12-cv-2292, 2014 WL 12600136, at *6 (N.D. Ohio Mar. 28, 2014)). Even if this proposition were correct, it is only relevant if the Court accepts *the Hospital's* version of the facts. But at summary judgment, we must view the facts in the light most favorable to King. *Kirilenko-Ison*, 974 F.3d at 660 (citing *Matsushita Elec.*, 475 U.S. at 587). While the Hospital believes that King called on May 19 only "to ask if she was eligible" for FMLA leave, (Fischer Decl., R. 49-2, Page ID #1378), King disputes this fact. According to King, she told FMLASource that she "was calling in to request the leave" because of her asthma. (King Dep., R. 44, Page ID #266.) Taking King's version as true, this would satisfy her burden to request an accommodation *even if* King only asked for FMLA leave (for which she was ineligible) rather than non-FMLA, and *even if* she did not say how much time off she needed. *See Ford Motor Co.*, 782 F.3d at 779 (Moore, J., dissenting) (employees "do not need to identify the perfect accommodation from the start"). Thus, a jury could find that King requested an accommodation in her May 19 call with FMLASource.

*Third*, after calling FMLASource on May 19, King told a human resources employee (Burns) and her supervisor (Bungard) that she was seeking medical leave. King called Burns on May 19 and said that she was trying to apply for leave but that FMLASource was not letting her because of her low hours. Roughly a week later, King called Bungard and said that she "was

trying to apply for the hospital's medical leave and FMLA." (King Dep., R. 44, Page ID #271.) At this point, multiple people within Hospital leadership knew that King was seeking medical leave to deal with her asthma flare-up:  Burns, Bungard, the FMLASource representative that King called on May 19, and the other on-call supervisors that King contacted to call in sick between May 19 and June 2.

*Finally*, King called FMLASource two more times on May 30 and June 5.  In response, FMLASource sent King a letter on June 5 stating that it had "received [her] *request for leave*," but that it needed more medical documentation to support her request.  (FMLASource Letter, R. 44, Page ID #650 (emphasis added).)  King completed her leave application, including supporting medical documentation, on June 6.[5]  A jury could find that King first requested leave on May 19 and that her application for leave was outstanding for two weeks before it was finalized on June 6, when Dr. Alam submitted a medical certification form indicating that King needed leave between April 28 and June 1.  Viewed in the light most favorable to King, the record shows that she made several requests for medical leave between May 19 and June 6.

These requests triggered the Hospital's duty to engage in an interactive process to determine whether it could reasonably accommodate King's asthma flare-up.  *See Hostettler*, 895 F.3d at 857.  The record indicates that the Hospital did not participate in that process in good faith in three ways.  *First*, the record indicates that FMLASource violated the Hospital's own policies on May 19 when it did not consider King's eligibility for non-FMLA leave.  Even if King only asked for FMLA leave, FMLASource was obligated to consider her eligibility for both FMLA and non-FMLA leave.  But FMLASource simply told King that she was ineligible for FMLA leave and refused to allow her to actually make a request.  As King puts it, she "was immediately rebuffed by FMLASource."  (Pl. Br. at 6.)  This shows the Hospital's bad faith refusal to consider her May 19 request for leave.  *See Kleiber v. Honda of Am. Mfg., Inc.*,

---

[5]There is some disagreement over whether an employee can properly request an accommodation after her employer terminates her.  *Compare Johnson v. Otter Tail Cnty.*, No. 00-3098, 2001 WL 664217, at *1 (8th Cir. May 14, 2001) ("[P]ost-termination requests for accommodation are not properly viewed as requests for accommodation at all, but, rather, as requests for reinstatement." (citing *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1218 (8th Cir. 1999))), *with Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1286 (7th Cir. 1996) (employers must consider accommodation requests made shortly after the employee's termination).  We do not need to wade into this debate because the record shows that King was trying to apply for medical leave well before her termination on June 2.  *See Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009).

485 F.3d 862, 872 (6th Cir. 2007) (employers may not "rebuff[]" an employee's request for an accommodation); *Rorrer*, 743 F.3d at 1046 (noting that an employer's failure to discuss the employee's request is evidence of bad faith (citing *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 622 (5th Cir. 2009))).

*Second*, the record indicates that the Hospital unreasonably stalled King's request because of *FMLASource's* errors. On May 19, FMLASource did not have accurate timesheets because of a recent change in the Hospital's management. Yet FMLASource made no effort to independently confirm or correct King's hours. Rather than reaching out to the proper human resources representative (Burns) to fix King's hours, FMLASource told King she had to reach out to Burns herself. Although the Hospital and FMLASource caused the error, they did nothing to fix it. Even after King called Burns, Burns did little to help. It took several weeks for FMLASource to update King's hours, and, when it finally did, no one told King. King had to call FMLASource two more times—on May 30 and June 5—before FMLASource updated her hours and let her file a formal application for leave. Ultimately, the Hospital put the onus on King to fix its own mistake. A jury could find that the Hospital obstructed King's attempts to apply for leave and thereby failed to participate in the interactive process in good faith. *See Rorrer*, 743 F.3d at 1040–41 ("[F]ailing to assist an employee in seeking an accommodation may suggest bad faith." (citing *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 902 (8th Cir. 2006))); *Kleiber*, 485 F.3d at 872 (refusing to provide information to the employee is evidence of bad faith).

*Finally*, the Hospital prematurely halted the interactive process by terminating King while her leave request was still outstanding. *See Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 336 (6th Cir. 2013) (employer fails to engage in good faith when "the interactive process . . . was still ongoing when the employer terminated the worker's employment" (citing *Bultemeyer*, 100 F.3d at 1284–87)). "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Cutrera v. La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). And if the employer terminated the employee before fully considering the request for an accommodation, then the employer may need to "reconsider

the decision to terminate" the employee.  *See Bultemeyer*, 100 F.3d at 1286.  Bungard knew that King was trying to apply for leave and that she needed FMLASource to fix her hours.  Despite this knowledge, Bungard terminated her for failing to timely seek leave, even though he knew that King was trying to do just that.  Thus, King sufficiently requested an accommodation, but the Hospital failed to engage in the interactive process in the wake of her requests.

### d.  *Defendant Failed to Provide the Accommodation*

As discussed above, construing the facts in her favor, King requested a reasonable accommodation—medical leave—to help manage her temporary asthma flare-up.  Ultimately, the Hospital retroactively approved King's request for non-FMLA leave between May 14 and June 1, but only *after* the Hospital terminated her.  But this retroactive approval did not give King the full benefits of non-FMLA leave.  Therefore, FMLASource denied King the accommodation that she sought.

As defined by the Hospital's own policies, non-FMLA leave provides that, "[u]pon returning from leave of absence, *the employee shall be reinstated* to the job assignment which [s]he formerly occupied."  (CBA, R. 44, Page ID #384 (emphasis added).)  Accordingly, one of the benefits of medical leave is that the employee will still have a job when she comes back from an approved leave.  After King requested leave on May 19—and while King was trying to fix FMLASource's erroneous hours records—the Hospital terminated her for "failure to apply timely for a leave of absence."[6]  (Bungard Dep., R. 50, Page ID #1419.)  But on June 22, the Hospital retroactively granted King's request for non-FMLA leave.  Even though the Hospital ultimately approved King's request for leave, it never gave her the benefits of an approved leave, which would have included reinstatement.  *Cf. Terre*, 708 F. App'x at 227 (recognizing that plaintiffs can bring a claim based on the theory that an employee "was granted an accommodation which was then made ineffective due to [the employee's] position being [terminated]," because the termination effectively "nullif[ied the] accommodation").  Employers

---

[6]King initially brought a wrongful termination claim.  *See King*, 2021 WL 1578076, at *5.  However, the district court found that she abandoned this claim, *id.*, and she does not challenge that finding on appeal.  The record offers little insight into why King decided not to pursue this claim.  But since King does not present this claim on appeal, we agree that she abandoned this cause of action.  *See United States v. Melton*, 782 F.3d 306, 308 n.1 (6th Cir. 2015) (citing *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014)).

cannot skirt liability by rubber stamping a period of medical leave *after* terminating the employee.  By granting King "leave" when she was no longer employed, King had no job to return to.  Thus, the post hoc approval of her request did not provide all of the protections that medical leave is designed give.  Accepting King's version of events, the Hospital did not give her all of the benefits of non-FMLA leave and, therefore, failed to provide a reasonable accommodation.

### 2. Undue Hardship to Employer

"Even where, as here, a plaintiff might be able to demonstrate a reasonable accommodation, a defendant can still be granted summary judgment, if there are no genuine issues of material fact controverting the conclusion that the reasonable accommodation would impose an undue hardship on the employer."  *Cleveland*, 83 F. App'x at 79.  "If the employee establishes that a reasonable accommodation is possible, then the employer bears the burden of proving that the accommodation is unreasonable and imposes an 'undue hardship' on the employer."  *Id.* (quoting *Cehrs*, 155 F.3d at 781–82).  "[T]he inquiry into reasonableness requires, 'a factual determination untethered to the defendant employer's particularized situation,' whereas the question of whether a reasonable accommodation imposes an undue burden is evaluated with regard to 'the employer's specific situation.'"  *Walsh*, 201 F.3d at 726 n.3 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 n.10 (6th Cir. 1996)).  Ohio law lists three factors that courts should consider: (1) business necessity; (2) financial considerations; and (3) any other factors that the employer "can support with objective evidence."  Ohio Admin. Code 4112-5-08(E)(3).  The Hospital has not shown that granting King's request for medical leave would cause it undue hardship.

When an employer believes that granting medical leave would cause undue hardship, courts first look to the employer's leave policies.  *See Walsh*, 201 F.3d at 726.  If the employer's policies provided for the kind of leave that the plaintiff sought, courts will presume that granting the plaintiff's request would not cause undue hardship.  *See id.*  For the same reasons as discussed above, *see supra* Part II.B.1.a, King's request for five weeks of non-FMLA leave was well within the Hospital's policies.  It also fell below the prolonged leaves that this Court has found unduly burdensome.  *See, e.g.*, *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 298 (6th Cir.

2015). Moreover, the Hospital allowed employees to seek emergency medical leave without advance notice, and even had policies in place for handling retroactive leave requests. *See supra* Part II.B.1.a. Anti-discrimination laws sometimes require employers to accommodate unexpected circumstances. Sudden illnesses and episodic flare-ups are, by nature, difficult to plan for and can be quite disruptive to those who fall ill and those around them. But that does not mean that accommodating a sudden flare-up will cause undue hardship merely because handling these situations requires more flexibility.

Additionally, the record shows that the Hospital did not actually suffer any undue hardship because of King's five-week absence. The Hospital did not have any significant staffing disruptions, and Bungard does not remember having to pick up any of King's missed shifts. Nor did King's absence amount to excessive absenteeism under the Hospital's disciplinary policies. King's consecutive absences only counted as a single "occasion" and did not warrant any disciplinary action.

Finally, at the very least, the Hospital has not shown that keeping King's job open while she applied for leave would have caused undue hardship. While keeping an employee's job open indefinitely may cause undue hardship, *see Aston*, 631 F. App'x at 298, keeping the job open long enough to allow the employee to apply for leave does not. Accepting King's version of events, the Hospital terminated King *after* she first sought leave from FMLASource and while she was trying to sort out her hours so that she could formally apply for leave. Thus, a jury could find that the Hospital did not meet its burden to show that granting King retroactive leave while keeping her job open would have caused undue hardship.

## III. CONCLUSION

For these reasons, we **REVERSE** the district court's order granting the Hospital's motion for summary judgment and **REMAND** for further proceedings consistent with this opinion.

―――――――――――――

**DISSENT**

―――――――――――――

GRIFFIN, Circuit Judge, dissenting.

Even though plaintiff Jeanne King never requested a specific term of medical leave, her employer, defendant Steward Trumbull Memorial Hospital, granted her the most leave that it could under the circumstances.  Because King's failure to request a definite term of leave and the hospital's grant of leave both independently foreclose her failure-to-accommodate claim, I would affirm the district court's grant of summary judgment in favor of defendant.  I therefore respectfully dissent.

I.

To establish a prima facie claim of failure-to-accommodate, King must show that "she is otherwise qualified for the position (with or without reasonable accommodation)."  *Stewart v. Bear Mgmt, Inc*., 98 N.E.3d 900, 905 (Ohio Ct. App. 2017) (citation omitted).[1]  This element requires King to "propose an accommodation that is objectively reasonable."  *Id.* (quotation omitted); *Kleiber v. Honda of Am. Mfg., Inc*., 485 F.3d 862, 869–70 (6th Cir. 2007).  Here, we deal with a request for medical leave, which can be an objectively reasonable accommodation only if it has a defined term.  *See, e.g., Williams v. AT&T Mobility Servs., LLC*, 847 F.3d 384, 394 (6th Cir. 2017).  Without a defined duration, a request for leave is per se unreasonable.  *See Monette v. Electr. Data Sys. Corp*., 90 F.3d 1173, 1187 (6th Cir. 1996), *abrogated in non-relevant part by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012); *Walsh v. United Parcel Serv*., 201 F.3d 718, 725–28 (6th Cir. 2000); *Lynch v. U.S. Postal Serv*., 3 F. App'x 287, 289 (6th Cir. 2001) (per curiam) ("Indefinite leave is not a reasonable accommodation."); *Allen v. BellSouth Telecomms., Inc*., 483 F. App'x 197, 201 (6th Cir. 2012) ("[O]pen-ended, indefinite requests for leave are not requests for reasonable accommodation.").

―――――――――――――

[1]King's claim arises under Ohio law, but because the Americans with Disabilities Act "is similar to the Ohio handicap discrimination law," courts "look to regulations and cases interpreting the federal Act for guidance in [their] interpretation of Ohio law." *See Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998).

King never proposed a definite term of medical leave while she was a hospital employee. Her only direct request for leave came on May 19, 2017, when she called the hospital's third-party leave administrator.  By her own admission, however, she did not ask for a specific amount of leave.  King Dep., R. 44, PageID 269  (Q: "[D]id you tell them how long of a leave that you needed?  A:  No.").  This vague request cannot be one for a reasonable accommodation. *See Monette*, 90 F.3d at 1187; *see also Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (plaintiff's failure to request "leave to a specific date" meant that his requested accommodation "was not reasonable").  This defeats King's failure-to-accommodate claim.  *See Gantt v. Wilson Sporting Goods Co*., 143 F.3d 1042, 1047 (6th Cir. 1998) (finding no genuine issue of material fact where "[t]he last thing the Company heard from Plaintiff [before firing her] was that she did not know when she would be able to return to work."); *see also Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (affirming grant of summary judgment in favor of employer where plaintiff "failed to present any evidence of the expected duration of her impairment as of the date of her termination.").

The majority excuses King from her burden to propose a reasonable accommodation by accusing the hospital of acting in bad faith when it did not provide an interactive process.  This argument is wholly of the court's own creation.  In our adversarial system, we "rely on the parties to frame the issues for decision" and do "not . . . sally forth each day looking for wrongs to right." *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) (citation omitted).  King has never alleged that the hospital acted in bad faith by denying an interactive process. Accordingly, this judicially created potential issue is forfeited for the purposes of this appeal. *See White Oak Prop. Dev., LLC, v. Washington Twp., Ohio*, 606 F.3d 842, 850 (6th Cir. 2010).

In sum, because King never requested a reasonable accommodation (i.e., a definite period of leave), her failure-to-accommodate claim fails as a matter of law.

II.

King's claim fails for another reason:  ultimately, the hospital granted her leave.  *See Stewart*, 98 N.E.3d at 905 (to have a failure-to-accommodate claim, the employer must have "failed to provide the necessary accommodation.").  After defendant terminated King, she finally

asked for a definite period of unpaid leave.  The hospital retroactively granted her all of the leave that it could under the circumstances.

The majority opinion acknowledges that the hospital granted King's request for leave. Yet, my colleagues refuse to credit this grant of leave because, in their view, King did not receive the leave's full benefits, which means that her accommodation was effectively nullified. The majority's decision to ignore the accommodation that King received has no basis in law.  No other court has held that accommodations can be nullified by termination because doing so would destroy any distinction between failure-to-accommodate claims and wrongful-termination claims based on disability discrimination.  If an employee receives an accommodation and is then discharged, her harm is the loss of employment, not the denial of a reasonable accommodation.  And disability-discrimination law provides her a well-worn avenue to redress this harm:  a wrongful-termination claim based on disability discrimination.  *See Mattessich v. Weathersfield Twp.*, 59 N.E.3d 629, 635–36 (Ohio Ct. App. 2016).  Indeed, we have cautioned against collapsing failure-to-accommodate claims into discriminatory-discharge claims.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008).

King pursued a wrongful-termination claim below, but expressly abandoned it in response to the hospital's summary-judgment motion, deciding to focus instead on her failure-to-accommodate claim.  R. 56, PageID 1829 ("King shall limit her arguments to defending the failure of Defendant . . . to afford her a reasonable accommodation[.]").  The majority undoes this strategic decision by conjuring a nullification doctrine out of thin air so that her failure-to-accommodate claim can substitute for her abandoned wrongful-termination claim.

The majority's only support for its nullification doctrine is our unpublished opinion *Terre v. Hopson*, 708 F. App'x 221 (6th Cir. 2017).  But that non-precedential decision is far less consequential than the majority makes it seem.  In *Terre*, plaintiff's employer fired him while he was on approved disability leave.  *Id.* at 223.  The plaintiff claimed that his discharge while on leave nullified the leave's status as an accommodation, which meant that he had a failure-to-accommodate claim for denial of leave.  *Id.* at 227.  However, when *Terre* arrived in this court, the only issue before us was whether plaintiff had exhausted his administrative remedies on this nullification claim by including it in the charge that he filed with the Equal

Employment Opportunity Commission.  *Id.*  We held that he had.  *Id.*  We said nothing on the merits of plaintiff's claims or his nullification theory.

So where does the majority find its nullification doctrine?  It is not in *Terre*'s holding or even its dicta.  Instead, the quoted language that the majority cites is from our court's summary in *Terre* of the plaintiff's nullification argument, which we did not adjudicate.  *Id.*  I am not aware of any other case in which we have established a new rule of law based solely on a description of a party's unadjudicated argument.  Additionally, I note that when the district court ultimately ruled on the merits of Terre's nullification claim on remand, it rejected that argument out-of-hand.  *Terre v. Hopson*, No. 2:15-cv-2456, slip op. at 7 (W.D. Tenn. Dec. 10, 2018).  In short, even the non-precedent that the majority cites does not support its novel and unprincipled decision.

Here, instead of deciding the case before us according to well-established law, the majority creates a non-issue and seeks to eliminate the distinction between failure-to-accommodate claims and wrongful-termination claims.  I respectfully dissent because, in my view, it is clear that the hospital did not deprive King of any leave to which she was entitled.[2]  She therefore was not denied any accommodation.

III.

Because the district court correctly granted summary judgment in favor of defendant on plaintiff's failure-to-accommodate claim, I respectfully dissent.

---

[2]In addition to the majority's novel nullification theory, it also asserts that King's termination undermines the hospital's medical leave policy, as described in her collective bargaining agreement ("CBA").  However, King admits that she did not apply "for any of the leaves contained in the CBA."  Appellant's Br. 16.  Furthermore, I note that King's union disagrees with the majority's application of these policies.  Before filing this suit, King grieved the hospital under the CBA, but her union dropped the case after it concluded that she had been "rightfully terminated."  King Dep. R. 44, PageID 177.